# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-19-00800-CR

---

**Christopher Joel Vizcaino, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 207TH DISTRICT COURT OF COMAL COUNTY
### NO. CR2017-935, THE HONORABLE DWIGHT E. PESCHEL, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Christopher Joel Vizcaino of three counts of aggravated sexual assault and assessed punishment at 21 years' imprisonment for each count. *See* Tex. Penal Code § 22.021. The district court rendered judgment on the verdicts. In three issues on appeal, Vizcaino asserts that the district court erred in not granting a mistrial due to juror misconduct, that the evidence is insufficient to support the jury's finding that he used a knife during the offense, and that the State asked a defense witness improper questions during its cross-examination of the witness. We will affirm the district court's judgments of conviction.

### BACKGROUND

The State alleged that on April 22, 2016, Vizcaino sexually assaulted the victim and used a deadly weapon, either his hands or a knife, during the commission of the assault. At

trial, the victim testified that on the night of the assault, she went to a local bar with her friends and was introduced to Clint Horne. The victim also met Vizcaino and "maybe exchanged a few words" with him but "didn't really talk to him the rest of the night." At around midnight, after the victim's friends had left the bar, the victim was talking to Horne in the parking lot when Vizcaino drove up to them in his truck and invited them to his cabin. The victim and Horne, driving together in the victim's truck, followed Vizcaino to his place.

When they arrived at Vizcaino's cabin, Vizcaino went inside first, followed by the victim, who turned around to see if Horne was "coming in behind" her. At that point, the victim testified, Vizcaino grabbed her hair and her head, pulled her into the kitchen, pushed her head toward his crotch, pulled out his penis from his pants, and forced his penis inside her mouth. After that, the victim looked for Horne but could not find him. Vizcaino told the victim, "Who the fuck cares where [Horne] is," and proceeded to grab her arm, pull her into another room, and throw her "violently onto the couch." Then Vizcaino "started smacking [her] and punching [her] back and forth and back and forth." The victim told Vizcaino to stop but he continued to assault her, slapping and punching her face repeatedly and choking her by applying pressure to her neck using both of his hands, which made it difficult for the victim to breathe.

Vizcaino then ripped apart the victim's clothing, including her leggings at the crotch area, and forced his penis inside her vagina, inside her anus, and between her breasts. The victim further testified that during the assault, she felt something else inside her:

> There was a pain I had never felt before. It wasn't like a normal penis going into your vagina or whatever. It was like something sharp. I didn't know if it was a bottle or like his fist or what it was, but it was like just an overwhelming, like, cramping pain and sharp pain. I don't really know how to describe it.

2

The victim was unable to identify the object because "it was dark" and she "really couldn't see," but whatever the object was, it made her bleed profusely. She explained:

> I happened to look, and he had [blood] all on his arm—like, on his hand and on his arm. And that's what made me believe that it was his, like, whole arm or fist that he had put in there, because it was covered in blood. And so I at that point said, Oh, my God. What did do you? And he went and grabbed a rag, I think, or something. And that's when he, like, was wiping off his—trying to, like, wipe off his arm and wipe off my—like, all the blood, I guess, from my private.

In an attempt to escape, the victim told Vizcaino that she needed to use the restroom. But Vizcaino "wouldn't stop," and the victim kept trying to push him off her. She recounted, "[A]fter being violently hit multiple times, . . . it was hard to get up. . . . I just kept trying to push him off, and he wouldn't get off of me. And then finally he did, and I was able to run for the front door and get out of there." The victim ran to her truck and found Horne "asleep inside the truck."

The victim awakened Horne, told him what had happened, and asked him why he had failed to protect her. She then drove Horne to an RV park where he was staying at the time, dropped him off there, and returned to her home. When she got out of her truck, she fell to the ground. She texted a friend and asked for help, but her friend did not respond. The victim eventually made it to her bathroom and sat on the toilet, continuing to bleed and "trying to . . . keep my head up and not pass out." Later that morning, her friend came over to her house in response to the text. The victim met her outside and "immediately collapsed into the front yard."

The victim's friend testified that the victim appeared to be holding "a big clump of blood" and looked like she was "on her period or like giving birth or something." The friend

3

observed "a lot of blood" outside the victim's house and wondered if the victim had been "cut or shot":

> [I]t was clots, like clots of blood, like—like clots, like, hanging off the side of the door, like, on the—in the truck, like, on the ground or, like, it was enough you could just pick up and put in bowls. Like, I've never seen it before in my life.

The friend called 911, and an investigation into the assault began. The victim was examined that afternoon by a sexual assault nurse examiner (SANE). The SANE testified that the victim had redness, bruising, and swelling on her face and neck. The victim also had nine lacerations on her genitals, some of which were still bleeding at the time of the exam. Although the SANE could not identify the object that caused the lacerations, another SANE who assisted with the examination testified that they could have been caused by a sharp object.

At the victim's house, investigators discovered a large amount of blood inside and outside the residence and inside the victim's truck. One of the investigators, crime scene technician Carlos Alvarado, testified, "Usually on a scene like this, when there is that much blood, it's been my experience that there was a sharp object that was used where one would bleed profusely, not—usually a gunshot doesn't even bleed as much as what I saw there." Investigators next searched Vizcaino's residence and found blood in several locations, including on his couch, which Alvarado testified was "soaked" with blood. Investigators also discovered a switchblade-style knife with an open blade that "was covered in blood, especially around the tip." DNA testing revealed that the blood on the knife belonged to the victim.

After hearing the evidence, the jury found Vizcaino guilty of aggravated sexual assault as charged. This appeal followed.

4

**DISCUSSION**

**Sufficiency**

We first address Vizcaino's second issue, in which he asserts that the evidence is insufficient to prove that he used a knife during the assault. To convict Vizcaino of aggravated sexual assault as charged in the indictment, the State was required to prove that Vizcaino used a deadly weapon, specifically a knife or his hands, during the offense.[1] *See* Tex. Penal Code § 22.021(a)(2)(A)(iv) (person commits aggravated sexual assault if, among other requirements, person "uses or exhibits a deadly weapon in the course of the same criminal episode"); *see also id*. § 1.07(a)(17)(B) (defining deadly weapon as "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury"). According to Vizcaino, "There is no evidence to support a finding that a knife was used or exhibited in the commission of a sexual assault, making the finding of the use or exhibition of a knife irrational."

"Evidence is sufficient to support a criminal conviction if a rational jury could find each essential element of the offense beyond a reasonable doubt." *Stahmann v. State*, 602 S.W.3d 573, 577 (Tex. Crim. App. 2020) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "We view the evidence in the light most favorable to the verdict and consider all of the admitted evidence, regardless of whether it was properly admitted." *Id*. "The jury is the sole judge of credibility and weight to be attached to the testimony of the witnesses." *Id*. "Juries can draw

---

[1] Although Vizcaino focuses his argument on the knife, the State alleged in the alternative that Vizcaino used his hands as a deadly weapon, based on evidence tending to show that Vizcaino had choked the victim. Because we conclude that the evidence is sufficient to support the finding that a knife was used as a deadly weapon, we need not address the sufficiency of the evidence regarding whether Vizcaino used his hands as a deadly weapon. *See Herrin v. State*, 125 S.W.3d 436, 441 (Tex. Crim. App. 2002); *Reser v. State*, No. 03-15-00469-CR, 2016 WL 6408006, at *2 n.5 (Tex. App.—Austin Oct. 25, 2016, pet. ref'd) (mem. op., not designated for publication).

reasonable inferences from the evidence so long as each inference is supported by the evidence produced at trial." *Id.* A reviewing court is not permitted to "reevaluate the weight and credibility of the evidence in the record and thereby substitute [its] own judgment for that of the factfinder." *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018). Instead, a reviewing court is to "adhere to the *Jackson* standard and determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007). "When the record supports conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict and defer to that determination." *Merritt v. State*, 368 S.W.3d 516, 525-26 (Tex. Crim. App. 2012).

To support his claim that there was no evidence that he used a knife, Vizcaino points to evidence in the record tending to show that the object used during the assault was not identified, including the victim's testimony that she did not see the object, Alvarado's testimony on cross-examination denying that he had reported that the victim had been "stabbed in the vagina," and the SANE's testimony that she did not know what object was used to penetrate the victim. However, the jury could have reasonably inferred from other evidence in the record that the object was a knife, including:

- The victim testified that she felt a "sharp pain" and "something sharp" inside her during the assault.

- The object caused massive bleeding that made the victim's friend wonder if the victim had been "cut or shot."

- The SANE testified that the victim had nine lacerations on her genitals. Another SANE who had assisted with the examination testified that the victim's injuries could have been caused by a sharp object.

6

- Crime scene technician Alvarado testified that there was a large amount of blood inside and outside the victim's residence and that "when there is that much blood, it's been my experience that there was a sharp object that was used where one would bleed profusely." Later in his testimony, he added, "[S]omeone that bleeds out that much is consistent with somebody being cut, from my experience."

- Alvarado further testified that he had seen a similar quantity of blood "in a stabbing" and that blood from a stabbing can have a "clumpy" appearance, similar to the blood that was found at the victim's residence.

- Alvarado testified that at Vizcaino's residence, investigators found a switchblade knife that "was covered in blood, especially around the tip." That blood, according to the DNA evidence presented, belonged to the victim. When the State asked Alvarado if there was "significance in the fact that the blood was on both sides of the blade and not just a single side," Alvarado testified, "To me, that's—from my experience, that would indicate that it was used for piercing something, to be able to obtain the blood on both sides."

Viewing the combined and cumulative force of the above evidence in the light most favorable to the verdict, we conclude that the evidence is sufficient to prove that Vizcaino used a knife during the assault. *See Morales v. State*, 633 S.W.2d 866, 868 (Tex. Crim. App. 1982) (concluding that even though victim did not see knife that was used during assault, nature of victim's injuries and other evidence was sufficient to support deadly weapon finding); *Webber v. State*, 757 S.W.2d 51, 54 (Tex. App.—Houston [14th Dist.] 1988, pet. ref'd) (concluding that "victim need not see the weapon" used during offense to support deadly weapon finding); *see also Thurman v. State*, No. 01-02-00030-CR, 2002 WL 31430557, at *2–3 (Tex. App.—Houston [1st Dist.] Oct. 31, 2002, no pet.) (not designated for publication) (concluding that even though State was unable to produce evidence "conclusively linking" recovered knives to victim's injuries, victim's testimony regarding pain that he "felt" during assault and nature and extent of victim's injuries supported finding that knife was used during assault).

We overrule Vizcaino's second issue.

7

**Mistrial**

In his first issue, Vizcaino claims that the district court abused its discretion in denying his motion for mistrial due to juror misconduct. After Vizcaino was found guilty but before the hearing on punishment, defense counsel informed the district court that the night before the hearing, he had received a text message telling him that Vizcaino's wife and potential witness for the State, Jessica Thomas, was seen "hugging a juror."[2] The same day that defense counsel received the text message, the court bailiff had received a phone call from an anonymous caller, later identified as Vizcaino's uncle, claiming that the juror knew the defendant's wife, the defendant, and the victim.[3] The bailiff explained to the court:

> [He] proceeded to tell me that the Defendant's wife, Jessica Thomas, had an ongoing custody dispute with the Defendant during the time of the sexual assault. He went on to say that the Defendant's wife knows the victim [] and the Defendant's wife is lifelong friends with a juror on our panel. He went on to say that the juror on our panel also knows [the victim] and the Defendant, and the Defendant has done work for her at her home on her air conditioning unit.

The bailiff asked the caller "specifically where [he got] this information," and the caller told him that he heard it from Vizcaino's mother.

Both Thomas and the juror were questioned to determine the truth of these allegations. Thomas testified that she knew the juror and the juror's "whole family," had grown up with the juror, and was "really good friends with her sister." Thomas did not know whether the juror knew either the victim or Vizcaino, but she knew that Vizcaino had done "AC work for [the juror's] dad." When asked about her contact with the juror, which had occurred two days

---

[2] The State had subpoenaed Thomas as a possible witness, but she did not testify at trial.

[3] The bailiff's phone had caller ID, and he testified that the number belonged to a "Ronald Lamb." Thomas later testified that Lamb is Vizcaino's uncle.

earlier, while the guilt / innocence phase of trial was still ongoing, Thomas explained, "I didn't contact [her]. I didn't even realize it was her until we were outside and we caught eyes and gave a side hug. And that was it." She added, "It was simple as, I thought that was you, and then left it at that because I wasn't trying to get in trouble, and I'm sure she wasn't either." Thomas testified that she and the juror had no discussions or conversations about the case. Thomas also testified that it was "possible" that the juror knew of the custody dispute between her and Vizcaino because Thomas and the juror were "friends on Facebook."

On cross-examination by the State, Thomas testified that she had not posted any details of the sexual-assault case on Facebook but had exchanged private messages with her friends about the case on Facebook Messenger. She did not know whether she had exchanged any such messages with the juror because "this case has been going on for four years." Regarding the victim, Thomas testified that she "looks familiar" but she did not know if she knew her or not. She explained, "I mean, it's a small town, so I can't say. But I've never met her, I've never spoken to her." When asked if she had "any type of a friendship or close relationship with [the victim]," Thomas testified, "No."

Before Thomas was excused, the district court asked her "what exactly did [the juror] say to [her]" during their encounter. Thomas answered,

> [W]e walked out of the coffee shop, and she was walking this way, and we smiled at each other. And that's when we were like, okay, we do—we do know each other. And she gave me a hug and she said, I thought I recognized you. I said, It's nice to see you. And that's it.

9

The district court next questioned the juror. When asked if she knew Thomas, the juror testified, "My family grew up in, kind of like, the same neighborhood, but I don't 'know' know her personally." She elaborated,

> I didn't grow up with her, but we grew up in the same neighborhood. I think, if I'm not mistaken, I have a couple years on her. I didn't even go to school with her, I don't believe. . . . I have an older sister, and she has an older sister, that could have went to school together, but I didn't. . . . I have multiple sisters, and she does as well, as far as I know.

The court also asked the juror, "So do you have any kind of social interaction with Ms. Thomas, other than growing up in the same neighborhood?" The juror answered, "We're Facebook friends, yes. Do I speak to her? No. Have I spoke to her? No." The court then asked the juror about her and Thomas hugging. The juror explained, "When we were at the coffee shop, and me and [another juror] were going in, she grabbed me when I walked out and hugged me around my neck, yes." The juror added that during the encounter, she "didn't say anything" to Thomas. The juror also testified that she did not know either the victim or Vizcaino and that, before the trial, she had "never seen that man." The court asked the juror if her "relationship, such as it is, with you and Ms. Thomas" could affect her "ability to be fair and impartial in this case." The juror answered, "Absolutely not."

After that, defense counsel moved for a mistrial on the following basis: "The State's subpoenaed witness hugged and had an encounter, as brief as it may be, with a juror during the guilt/innocence phase of the trial. And for those reasons we would move for a mistrial." The district court denied the motion, telling defense counsel, "No, that's not going to happen."

"We review a trial court's denial of a mistrial for an abuse of discretion." *Balderas v. State*, 517 S.W.3d 756, 783 (Tex. Crim. App. 2016). "Determinations of historical fact and assessment of witness credibility and believability are left almost entirely to the discretion of the trial judge, and where there is conflicting evidence there is no abuse of discretion if the motion is overruled." *Hughes v. State*, 24 S.W.3d 833, 842 (Tex. Crim. App. 2000). "We review the evidence in the light most favorable to the trial court's ruling and consider only those arguments before the court at the time of the ruling." *Turner v. State*, 570 S.W.3d 250, 268 (Tex. Crim. App. 2018). "The trial court's ruling must be upheld if it was within the zone of reasonable disagreement." *Id.*

"A mistrial is an appropriate remedy in extreme circumstances for a narrow class of highly prejudicial and incurable errors." *Id.* "Whether an error requires a mistrial must be determined by the particular facts of the case." *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009). To warrant a mistrial based on juror misconduct, "the movant must establish not only that jury misconduct occurred, but also that it was material and probably caused injury." *Ryser v. State*, 453 S.W.3d 17, 39 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd) (citing *Bogue v. State*, 204 S.W.3d 828, 829 (Tex. App.—Texarkana 2006, pet. ref'd)); *see also Decker v. State*, 717 S.W.2d 903, 907 (Tex. Crim. App. 1986) (op. on reh'g) (concluding that information juror withheld during voir dire, regarding his acquaintance with complaining witness, was not material and thus did not entitle defendant to mistrial); *Lopez v. State*, 261 S.W.3d 103, 107 (Tex. App.—San Antonio 2008, pet. ref'd) ("When the withheld information is not material and the record does not show the appellant has been deprived of an impartial jury or denied a fair trial, the trial court's denial of a motion for mistrial is not error."). "To determine materiality, we evaluate whether the withheld information would likely reveal the juror harbored

11

a bias or prejudice to such a degree that the juror should have been excused from jury service." *Sypert v. State*, 196 S.W.3d 896, 900 (Tex. App.—Texarkana 2006, pet. ref'd).

The State argues as an initial matter that Vizcaino's objection at trial does not correspond with his complaint on appeal. We agree. At trial, Vizcaino moved for a mistrial on the basis that there was improper communication during trial between a juror and a potential witness. Specifically, he argued that "the State's subpoenaed witness hugged and had an encounter, as brief as it may be, with a juror during the guilt/innocence phase of the trial." On appeal, Vizcaino argues that prior to trial, the juror knew Vizcaino, Vizcaino's wife, and the victim and withheld this information during voir dire. Because Vizcaino's complaint on appeal differs from his objection at trial, he has failed to preserve error on this issue. *See* Tex. R. App. P. 33.1(a)(1); *Yazdchi v. State*, 428 S.W.3d 831, 844 (Tex. Crim. App. 2014) (citing *Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002)); *see also Bueno v. State*, No. 05-18-00432-CR, 2018 WL 3387367, at *2 (Tex. App.—Dallas July 12, 2018, no pet.) (mem. op., not designated for publication) (concluding that appellant failed to preserve error when motion for mistrial was based on two jurors discussing case outside presence of other jurors and before receiving all evidence, but complaint on appeal was that two jurors displayed bias or partiality against defendant).

Even if Vizcaino had preserved error, we could not conclude on this record that the district court abused its discretion in denying the motion for mistrial on either the ground asserted at trial or the ground urged on appeal. First, regarding the contact at the coffee shop between Thomas and the juror, "when jurors converse with an unauthorized person about a case, injury to the defendant is presumed and a new trial may be warranted." *Barnett v. State*, 420 S.W.3d 188, 193 (Tex. App.—Amarillo 2013, no pet.) (citing *Quinn v. State*, 958 S.W.2d 395,

12

401 (Tex. Crim. App. 1997)).  "If the presumption of harm arises, the State has the burden to rebut the presumption by showing no injury or prejudice to the accused." *Klapesky v. State*, 256 S.W.3d 442, 452 (Tex. App.—Austin 2008, pet. ref'd).  "However, the defendant has the initial burden to show that a conversation *about the case on trial* occurred between a juror and an unauthorized person," and "[t]he defendant's burden is not satisfied if there is no showing what a reported conversation was about." *Id.* (emphasis added).

Here, both Thomas and the juror testified that their contact at the coffee shop was brief and did not involve any discussion about the case.  Thomas testified, "I didn't contact [the juror].  I didn't even realize it was her until we were outside and we caught eyes and gave a side hug.  And that was it."  She added, "It was simple as, I thought that was you, and then left it at that because I wasn't trying to get in trouble, and I'm sure she wasn't either."  When the district court asked Thomas what the juror said to her, Thomas testified, "[W]e walked out of the coffee shop, and she was walking this way, and we smiled at each other.  And that's when we were like, okay, we do—we do know each other."  She continued, "And she gave me a hug and she said, I thought I recognized you.  I said, 'It's nice to see you.'  And that's it."  The juror testified similarly regarding their encounter and hug, although she claimed that she "didn't say anything" to Thomas.  Thus, the evidence shows that Thomas and the juror either acknowledged that they knew each other or merely hugged and said nothing at all.  Either way, the record supports a finding by the district court that they had no conversation regarding the case.  Accordingly, the district court would not have abused its discretion in denying the motion for mistrial on that ground.  *See Chambliss v. State*, 647 S.W.2d 257, 263–66 (Tex. Crim. App. 1983) (no error in denying mistrial when juror approached victim's sister, shook her hand, introduced himself, and asked for her address; record did not show that juror "in any way discussed appellant's case, or

13

that [victim's sister] did"); *see also Ortiz v. State*, No. 04-05-00524-CR, 2006 WL 1233029, at *2 (Tex. App.—San Antonio May 10, 2006, no pet.) (not designated for publication) (no error in denying mistrial when juror approached victim's mother, hugged her, and said, "my condolences for your loss"; concluding that "no discussion over the case took place between the juror and the victim's mother" and that, even if it had, limited extent of discussion "was not prejudicial to the accused").

We reach the same conclusion regarding the juror's alleged withholding of information during voir dire. The Court of Criminal Appeals has "long insisted that counsel be diligent in eliciting pertinent information from prospective jurors during voir dire in an effort to uncover potential prejudice or bias." *Gonzales v. State*, 3 S.W.3d 915, 917 (Tex. Crim. App. 1999). In other words, "defense counsel has an obligation to ask questions calculated to bring out that information which might be said to indicate a juror's inability to be impartial, truthful, and the like." *Jones v. State*, 596 S.W.2d 134, 137 (Tex. Crim. App. 1980), *overruled on other grounds*, *Sneed v. State*, 670 S.W.2d 262, 266 (Tex. Crim. App. 1984). "Counsel must ask *specific* questions, not rely on broad ones, to satisfy this obligation." *Gonzales*, 3 S.W.3d at 917. "Unless defense counsel asks such questions . . . the purportedly material information which a juror fails to disclose is not really 'withheld' so as to constitute misconduct which would warrant a reversal." *Jones*, 596 S.W.2d at 137. A mistrial is required only when the juror withholds material information in response to a question from the parties or the court. *See Franklin v. State*, 138 S.W.3d 351, 353–57 (Tex. Crim. App. 2004).

Here, during the hearing on the motion for mistrial, the district court asked defense counsel whether he had posed "a question to the panel about whether they knew Jessica

14

Thomas." Defense counsel acknowledged that he did not, and the record confirms this.[4] Thus, the district court would not have abused its discretion in finding that the juror did not "withhold" information regarding her relationship with Thomas so as to require a mistrial. *See Jones*, 596 S.W.2d at 136–37 (no error in denying mistrial where defense counsel failed to ask juror follow-up questions related to her past employment as jail guard that might show bias against defendant); *see also Armstrong v. State*, 897 S.W.2d 361, 365 (Tex. Crim. App. 1995) (no error in denying mistrial where counsel did not ask question that would uncover juror's friendship with prosecutor).

Moreover, even if the juror had withheld information regarding her relationship with Thomas, it would not be outside the zone of reasonable disagreement for the district court to conclude that such information was not material. Thomas and the juror acknowledged that they were "Facebook friends," though their testimony differed as to the extent of their friendship. Although Thomas testified that she knew the juror and the juror's "whole family," had grown up with the juror, and was "really good friends with her sister," the juror testified that she did not "'know' know her personally" and "didn't grow up with [Thomas], but we grew up in the same neighborhood." The juror also testified that she had "a couple years on" Thomas and that she "didn't even go to school with her." Further, the district court asked the juror, "So do you have any kind of social interaction with Ms. Thomas, other than growing up in the same neighborhood?" The juror answered, "We're Facebook friends, yes. Do I speak to her? No. Have I spoke to her? No." The district court was entitled to resolve the conflicting testimony in favor of the juror's account and conclude that her acquaintance with Thomas, even if it had been

---

[4] The record reflects that during voir dire, defense counsel asked the panel if they knew Clint Horne, the victim, the victim's friend, the owner of and a waitress at the bar where the victim met Vizcaino, and "any members of the Comal County Sheriff's Office."

withheld during voir dire, was not information that would likely reveal the juror harbored a bias or prejudice to such a degree that the juror should have been excused from jury service. *See Franklin v. State*, 12 S.W.3d 473, 478 (Tex. Crim. App. 2000) ("[M]ere familiarity with a witness is not necessarily material information."); *Decker*, 717 S.W.2d at 906–07 (concluding that even though juror and complaining witness were co-workers who knew each other, there was no showing that their relationship had any potential for bias or prejudice on part of juror); *see also Anderson v. State*, 633 S.W.2d 851, 853 (Tex. Crim. App. 1982) (concluding that although juror's acquaintance with State's witnesses "may be the source of an existing bias," "'the mere fact that a juror knows, or is a neighbor, or an intimate acquaintance of, and on friendly relations with, one of the parties to a suit, is not sufficient basis for disqualification'" (quoting *Allbright v. Smith*, 5 S.W.2d 970 (Tex. Comm. App. 1928))).

Finally, regarding Vizcaino's claim that the juror knew both the defendant and the victim, the juror denied knowing either one of them and testified that, before the trial, she had "never seen" Vizcaino. The district court was entitled to believe the juror's testimony and disbelieve the hearsay claims to the contrary that Vizcaino's family members had relayed to defense counsel via text message and to the bailiff via an anonymous phone call. On this record, we cannot conclude that the district court abused its discretion in denying the motion for mistrial. *See Uranga v. State*, 330 S.W.3d 301, 306–07 (Tex. Crim. App. 2010).

We overrule Vizcaino's first issue.

**Questioning of defense witness**

In his third issue, Vizcaino asserts that the State asked improper questions of defense witness Clint Horne, the person who had accompanied the victim to Vizcaino's cabin.

16

On direct examination, Horne testified that he, Vizcaino, and the victim had entered Vizcaino's cabin together. When they were inside, Vizcaino "pulled out his [penis] and [the victim] voluntarily went down to suck it." This made Horne uncomfortable, so he left the cabin and returned to the victim's truck, where he fell asleep. Approximately one hour later, the victim returned to the truck, woke Horne, and asked him, "Why did you leave me in there? He beat me up. Why did you leave me in there?" Horne testified that this confused him because he "didn't see any blood" on the victim, "she didn't seem beat up," and her clothes were not torn or ripped.

On cross-examination, the State questioned Horne regarding his criminal history, including his probationary status at the time of his testimony. The following questions were asked and answered without any objection from defense counsel:

Q. And, Mr. Horne, to be fair, you are currently on a form of felony probation, right?

A. Yes.

Q. It's called deferred adjudication, correct?

A. Yes.

Q. What offense are you on probation for?

A. Assault.

Q. Would it be continuous violence against a family member?

A. Yes.

Q. And you had had some prior misdemeanors in your past, correct?

17

A. Yes.

Q. But this was your first felony offense?

A. Right.

Q. And at the time of this incident, you were actually on bond for this felony, correct?

A. Yes.

Q. And being on bond is not quite as bad as being on probation, right? But it's still kind of a problem if you get in trouble while you're on bond, right?

A. Yes.

Q. If you get in trouble with the police while you're on bond, you're going to get locked up again, correct?

A. Yes.

Q. And, obviously, once you're on any type of a probation, if someone were to think that you did something wrong or that you violated the law, that could be a big problem for you, right?

A. Yes.

. . . .

Q. And, Mr. Horne, just so that we're not accused of hiding anything from the jury, the deferred adjudication that you were placed on, I was actually the prosecutor who placed you on that deferred adjudication, correct?

A.    Yes.

. . . .

Q.    And you understand that your probation, in the event that it is revoked, is not going to be affected in any way by your testimony, correct?

A.    Correct.

Q.    But you have been subsequently arrested, right?

A.    Yes.

Q.    As recently as July—end of July of this year, correct?

A.    Yes.

Q.    What do you think would happen if your probation were to be revoked because of that arrest in July, and at the time the Judge were to assess your punishment for your felony offense the Judge believed that you had left a woman to be sexually assaulted in a cabin?  What do you think would happen?

A.    Well, that's not the story, so I'd hope you wouldn't think that way.

Q.    Do you think your punishment would be more or less than what it would be otherwise?

A.    I would hope it wouldn't change it.

Q.    Well, you'd agree with me that—

A.    I didn't leave somebody to get sexually assaulted in a cabin.

Q.    You would agree with me that if a judge or the person deciding your

19

> punishment, if they believed that that's what actually happened, it could greatly affect your punishment, correct?
>
> A.     Sure.
>
> . . . .
>
> Q.     And I understand that this offense cannot be used to violate your deferred adjudication, but you do have a recent arrest and charge for unlawful use of a criminal instrument, which could be the basis—

At that point, defense counsel asked to approach the bench and questioned whether the prosecutor was "threatening" the witness. The prosecutor responded, "No, Judge, but the point is he does have a new law violation, and it could be used to violate his probation, and in that event anything—." The district court interjected,

> Well, you can do that without telling us what the offense is. . . . I'm going crazy up here about all this testimony. But, I mean, the cat is so much out of the bag, but do it without talking about [the offense]. . . . Or just don't do it at all, which is probably the better practice at this point. God. Okay. So what will you allow them to do, [defense counsel]?

Defense counsel replied, "I don't even really understand the line of questioning. I'll say improper impeachment is an objection." The district court remarked, "Oh, yeah. But that was— that cat—that happened so long ago." Defense counsel explained, "I just wanted to approach because it's coming across, I know it's probably not the intent, but it's coming across as him being threatened for his testimony." The prosecutor responded, "No. It just goes to his motive or bias with his testimony." The district court concluded that "it is such a mess right now because there weren't any objections" and instructed the parties to "[c]lean it up." The

20

prosecutor then continued her line of questioning, without any further objection from defense counsel:

Q.   Mr. Horne, it's your understanding that, after being placed on community supervision in September of 2017, any new law violation could result in that probation being revoked, correct?

A.   Yes.

Q.   And in the event that your probation gets revoked, you could be assessed prison time; is that right?

A.   Yes.

Q.   And there is a range of punishment for this particular offense that you're on community supervision for, right?

A.   Yes.

Q.   Do you recall it's anywhere from two years in prison up to ten years in prison, correct?

A.   Yes.

Q.   You have had an allegation—and to be fair, you are presumed innocent at this point. But you have had a subsequent arrest for a new law violation, correct?

A.   Yes.

Q.   Since you've been placed on probation?

A.   Yes.

Q.   And if or in the event that your probation is revoked because of that separate offense, the Judge could consider anything and everything in determining where in that range of punishment to assess, correct?

A.   Yes.

Q.   So even though it couldn't be used to revoke your probation, your possible involvement in this case, in whatever capacity that fact finder determines it, could be a factor in determining what your sentence—you ultimately receive, correct?

A.   If that's what you say, I guess.

The prosecutor then passed the witness, and defense counsel asked Horne no further questions.

The State argues that Vizcaino failed to preserve this issue for review. We agree. As a prerequisite to presenting a complaint for appellate review, the record must show that the complaint was made to the trial court by a timely request, objection, or motion. Tex. R. App. P. 33.1(a)(1). "The requirement of a timely trial-level complaint is satisfied 'if the party makes the complaint as soon as the grounds for it become apparent[.]'" *Lackey v. State*, 364 S.W.3d 837, 843 (Tex. Crim. App. 2012) (quoting *Gillenwaters v. State*, 205 S.W.3d 534, 537 (Tex. Crim. App. 2006)). An objection to the improper questioning of a witness must be urged at the earliest opportunity or it is not preserved for appellate review. *See Cisneros v. State*, 692 S.W.2d 78, 82 (Tex. Crim. App. 1985); *Stevens v. State*, 671 S.W.2d 517, 521 (Tex. Crim. App. 1984); *Bynum v. State*, 731 S.W.2d 661, 664–65 (Tex. App.—Houston [14th Dist.] 1987, no pet.).

Here, by the time that defense counsel had complained of the prosecutor "threatening" the witness, the prosecutor had already asked and Horne had already answered several questions relating to his probationary status and the possible impact that Horne's failing to prevent the assault could have on his sentence following any proceedings to revoke Horne's

22

probation. Thus, the objection was untimely. *See* Tex. R. App. P. 33.1(a)(1); *Bynum*, 731 S.W.2d at 665. Moreover, even after he had objected, defense counsel failed to obtain a running objection to additional questions by the prosecutor relating to that same subject matter. *See Ethington v. State*, 819 S.W.2d 854, 859–60 (Tex. Crim. App. 1991).

Additionally, we review a trial court's ruling on the admissibility of evidence under an abuse-of-discretion standard and uphold the trial court's ruling unless it is outside the zone of reasonable disagreement. *Gonzalez v. State*, 544 S.W.3d 363, 370 (Tex. Crim. App. 2018). "Exposing a witness's motivation to testify for or against the accused or the State is a proper and important purpose of cross-examination." *Carpenter v. State*, 979 S.W.2d 633, 634 (Tex. Crim. App. 1998). "Parties are allowed great latitude to show 'any fact which would or might tend to establish ill feeling, bias, motive and animus on the part of the witness.'" *Id.* (quoting *London v. State*, 739 S.W.2d 842, 846 (Tex. Crim. App. 1987)). In this case, it would not have been outside the zone of reasonable disagreement for the district court to conclude that evidence related to Horne's probationary status was admissible to show that he had a motive either to deny that an assault had occurred or to minimize its severity, issues that went directly to his credibility as a defense witness. Thus, even if Vizcaino had preserved this issue for review, we could not conclude on this record that the district court abused its discretion in admitting the evidence.

We overrule Vizcaino's third issue.

## CONCLUSION

We affirm the district court's judgments of conviction.

_____

Gisela D. Triana, Justice

Before Justices Goodwin, Triana, and Smith

Affirmed

Filed: March 31, 2021

Do Not Publish